**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

JOHN DAHLEN,                   :               CASE NO. 1:13-CV-1353

Plaintiff,                       :

vs.                                :

COMMISSIONER OF SOCIAL SECURITY,   :

DEFENDANT.                :         **MEMORANDUM DECISION AND
ORDER**

### I. INTRODUCTION.

In accordance with the provisions of 28 U. S. C § 636(c) and FED. R. CIV. P. 73, the parties in this case have voluntarily consented to have the undersigned United States Magistrate Judge conduct any and all proceedings in the case, including ordering the entry of a final judgment. Plaintiff seeks judicial review of Defendant's final determination denying his claims for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act); and Supplemental Security Income (SSI) under Title XVI of the Act.  Pending are the Briefs on the Merits of the parties (Docket Nos. 19 and 20).  For the reasons set forth below, the Magistrate affirms the Commissioner's decision.

## II.  PROCEDURAL BACKGROUND.

On January 18, 2011, Plaintiff completed an application for DIB alleging that he had become unable to work because of his disabling condition on December 20, 2010 (Docket No. 13, pp. 448-449 of 2279).  On January 20, 2011, Plaintiff applied for SSI alleging that his disability began on July 1, 2010 (Docket No. 13, pp. 452-454 of 2279).  The applications were denied initially and upon reconsideration (Docket No. 13, pp. 381-383; 384-386; 390-392; 393-395 of 2279).  Plaintiff made a timely request for an administrative hearing and Administrative Law Judge (ALJ) George Roscoe conducted both an initial hearing and a supplemental hearing.  On July 2, 2012, the ALJ issued a decision denying Plaintiff's application for DIB and SSI (Docket No. 13, pp. 364-366 of 2279).  On May 17, 2013, the Appeals Council denied review, rendering the ALJ's decision the final decision of the Commissioner (Docket No. 13, pp. 5-7 of 2279).  Plaintiff timely filed a Complaint in this Court seeking judicial review of the Commissioner's decision (Docket No. 1).

## III.  FACTUAL BACKGROUND.

The initial administrative hearing was conducted on February 8, 2012, at which Plaintiff, represented by counsel, and Vocational Expert (VE) Brett Salkin, a vocational rehabilitation counselor, appeared and testified.

### A.  PLAINTIFF'S TESTIMONY.

Plaintiff testified that he was 44 years of age,  weighed 255 pounds and is 5'8" tall.  He was single and lived alone.  Plaintiff completed one year of college majoring in auto mechanics.  He had taken adult vocational courses in carpentry, plumbing and also in auto mechanics.  Plaintiff could drive and he held a restricted driver's license requiring yearly renewal and medical waivers (Docket No. 13, pp. 275-276 of 2279).  As a veteran who spent six and one half years of active duty in the

2

United States Army and four years in the military reserves, Plaintiff received medical and financial benefits from the Department of Veterans Affairs (VA).  Plaintiff participated in a "workfare" program, working 32 hours weekly at Patriot Packaging, a company that provides commercial packaging solutions.  There, he folded and packed boxes without quotas or production requirements. For his work, the VA provided Plaintiff a monthly stipend.  Plaintiff's rent was subsidized by the Housing Choice Voucher Program and he received food vouchers through the Supplemental Nutrition Assistance Program (Docket No. 13, pp. 277-278; 286; 288 of 2279).

Recalling that he had been confined for six months in the Veteran's Hospital and for six weeks in the domiciliary care program, a clinical rehabilitation and treatment program for veterans, Plaintiff stated that he had been tobacco-free for eight years and that he had not used drugs since 1998.  He had been sober since 2003, and his "clean day" for gambling was  March 16, 2011.  To maintain his gambling addiction recovery, Plaintiff was treating through a program at the VA (Docket No. 13, pp. 281; 282-283; 286 of 2279; www.gov/homeless/dchv.asp).

As a civilian, Plaintiff was employed as a church custodian/handyman and commercial driver for ten years and eight years respectively.  Driving a truck through more than eleven Western states permitted Plaintiff to sustain his compulsive gambling addiction.  Plaintiff was discharged from his truck driving job, in part, because of his gambling.  Plaintiff claims that he became unable to drive a truck or perform any other work on July 1, 2010, because he developed a demented thought process which interfered with his ability to concentrate (Docket No. 13, pp. 278-279; 282-283; 291 of 2279).

Physically, Plaintiff suffered with urinary incontinence and bilateral carpal tunnel syndrome. Carpal tunnel surgery on both writs was scheduled for June and July. .Plaintiff admitted that he was not diabetic even though he wore "diabetic shoes" and he treated for neuropathy in his feet and legs.

3

Plaintiff was prescribed medication generally used to relieve neuropathic pain (Docket No. 13, pp. 279; 280; 284 of 2279).

Mentally, Plaintiff suffered from depression, fluctuating moods, nervousness, paranoia and an attention deficit hyperactivity disorder (ADHD).  He took Lithium and other anti-psychotic medication to manage his manic episodes, psychosis, and symptoms of ADHD.  For the most part, the medications were effective but the probable side effect was insomnia.  Plaintiff treated with a psychiatrist once monthly and a psychologist weekly (Docket No. 13, pp. 279; 280-281 of 2279).

Regarding functional abilities, Plaintiff estimated that he could (1) walk about 20 minutes at a time; (2) lift approximately ten pounds; and (3) sit for minimal amounts of time (Docket No. 13, pp. 284; 290 of 2279).  Plaintiff could not:  (1) stand for inordinate amounts of time without aggravating the neuropathy; (2) manipulate because he had no feeling in the finger tips on his right hand; (3) watch television or videos because of his inability to focus and/or concentrate; (4) cope with the noise from the crowds; and (5) assimilate with strangers (Docket No. 13, pp. 285; 291 of 2279).

During a typical day, Plaintiff was awakened between 4:00 and 5:00 A.M., showered, shaved and dressed.  He then took the bus to Patriot Packaging where he worked from 8:00 A.M., to 3:00 P.M.  Plaintiff prepared his meals and packed his lunches.  After work, Plaintiff completed his daily diary entry and completed necessary tasks such as shopping, laundry or housework.  Before moving into downtown Cleveland, Plaintiff attended Alcoholic Anonymous meetings nightly (Docket No. 13, pp. 287; 288; 289 of 2279).

### B.    THE VE'S TESTIMONY.

VE Salkin acknowledged that he was familiar with the Social Security definitions and that he had a duty to advise of any conflict between his opinions and the information in the DICTIONARY OF OCCUPATIONAL TITLES (DOT), a compilation of data and definitions in selected industries that provides the best "snapshot" of how jobs are performed in the majority of industries across the country (Docket No. 13, pp. 293, 294 of 2279; Www.occupationalinfor.org.).

VE Salkin categorized Plaintiff's past relevant work, excluding the work performed at Patriot Packing, as follows:

| JOB | SKILL LEVEL | EXERTION LEVEL |
|---|---|---|
| Custodian DOT 389.667-010 | Unskilled work is the least complex type of work, requiring little or no judgment.  Jobs are unskilled when persons can usually learn to do them in 30 days or less.    20 C. F. R. §§ 404.1568(a); 416.968(a). | Medium exertion involves lifting not more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  20 C. F. R. §§ 404.1568(c); 416.968(c). |
| Truck driver DOT 904.383-010 | Semi-skilled work is more complex than unskilled work and distinctly simpler than the more highly skilled types of jobs.  Such work requires more judgment than unskilled occupations and generally requires more than 30 days to learn.   20 C. F. R. §§ 404.1568(b); 416.968(b). | Medium exertion |

The ALJ posed the *first* hypothetical:

Assume an individual who is going to be 44 years of age, he has 12 years of education plus one year of college, can read and write and perform simple arithmetic; he is restricted to light work with additional limitations that he cannot climb ladders, ropes or scaffolds; that he cannot perform frequent fine handling and manipulation and he cannot be exposed to hazards including machinery and commercial driving. The individual has mental limitations that he can only understand, remember and carry out simple instructions and perform simple tasks without fast-paced, high production requirements, frequent routine changes and no more than superficial interpersonal reactions and no rapid changes and grasping (Docket No. 13, pp. 293-296 of 2279).

It was VE Salkin's opinion that this hypothetical person could not perform Plaintiff's past

relevant work; however, there were light exertional[1], unskilled jobs that existed in the five-county metropolitan Cleveland area, Ohio and the national economies, that the hypothetical individual could perform:

| Job/DOT Number | Number of Jobs in Cleveland/Ohio/national economies |
| --- | --- |
| Housekeeper<br>323.687-014 | 1,200/6,500/206,000 |
| Order filler<br>222.487-014 | 1,500/7,400/180,000 |
| Fast food worker<br>311.472-010 | 18,000/105,000/2 million |

VE Salkin testified that his testimony was consistent with the information found in DOT and it companion publication, SELECTED CHARACTERISTICS OF OCCUPATIONS[2] (Docket No. 13, pp. 296-297 of 2279).

In the *second* hypothetical, the ALJ posited:

Assume the same individual, same age, education and background, and same residual functional capacity with the additional limitation that he would be off task at least twenty percent of the time.  Could this individual perform past relevant work or other jobs existing in significant numbers in the economy?

The VE answered that the individual could not perform past relevant work or other jobs in the economy (Docket No. 13, p. 297 of 2279).

---

[1]

The regulations define light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing.  A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work.  20 C. F. R. §§ 404.1567(b); 416.967(b) (Thomson Reuters 2014).

[2]

This United States Department of Labor publication is the companion volume to the DOT.  These volumes were intended to provide a detailed representation of individual occupation in the United States for the purpose of occupational information, exploration and job placement.  Www.freebase.com.

6

Counsel posed a *third* hypothetical:

Assume the same individual, same age, education and background, and same residual function, except that the lifting and carrying are reduced to ten pounds maximum rather than twenty pounds. Could this individual perform the jobs identified in hypothetical one?

VE Salkin explained that the individual would not be able to perform any of the jobs cited and as well as any other jobs for the reason that fine finger manipulation would be important for the performance of sedentary work (Docket No. 13, p. 297 of 2279).

At this juncture, the ALJ ordered that Plaintiff submit to a consultative internal medicine examination and a consultative psychological examination without intelligence quotient (IQ) testing. The ALJ reserved the right to convene a supplemental hearing and/or to make a decision based on the new evidence and the record (Docket No. 13, pp. 297-298 of 2279).

2.      THE SUPPLEMENTAL HEARING.

After obtaining updated evidence including consultative examinations and records from the VA, ALJ Roscoe held a supplemental hearing. On May 29, 2012, Plaintiff, represented by counsel, and VE Dr. Nancy Borgeson, Ph.D., a vocational rehabilitation specialist, appeared and testified.

A.      PLAINTIFF'S TESTIMONY.

Since the last hearing, Plaintiff had been prescribed an increased dosage of Lithium; he had been confined to an inpatient psychiatric program; he was proceeding with pre-operation "stuff" related to his carpal tunnel surgery; and he had been attending a gambling aftercare treatment program. The increased dosage of medication had successfully reduced the frequency of paranoia episodes; Plaintiff had weekly psychiatric appointments and his medication regimen was reconciled while confined to the psychiatric program; Plaintiff had obtained confirmation that the carpal tunnel

surgery was imminent; and Plaintiff was having difficulty controlling the urge to gamble (Docket No. 13, pp. 260-261; 262 of 2279).

**B.    THE VE'S TESTIMONY**.

VE Borgeson acknowledged her duty to advise of any conflicts between her testimony and the DOT and she averred that she was familiar with the Social Security's definitions (Docket No. 13, p. 263 of 2279).  Initially VE Borgeson characterized Plaintiff's past work as meeting the medium physical exertional demands, skill level and specific vocational preparation (SVP)[3]:

| JOB | SKILL LEVEL | SVP |
|-----|-------------|-----|
| Custodian/Janitor DOT 323.687-014 | Unskilled work | Anything beyond a short demonstration up to and including one month. |
| Truck driver DOT 305.663-014 | Semi-skilled work | Over three months up to and including six months. |

In the *first* hypothetical, the ALJ asked that the VE:

. . . .Assume a person who is 44 years of age, with a 12-year education plus one year of college, can read and write and perform mathematics.  In terms of residual functional capacity, he can perform work of light exertional requirements as defined in the regulations, but he should not climb ladders, ropes or scaffolds; occasional to frequent handling and manipulation; no exposure to hazards and that would include heights, machinery and commercial driving; and mental limitations; that he could understand, remember and carry out simple work tasks without fast paced demands; high production quotas or frequent changes and that he has superficial interactions with others.  Could this person perform Plaintiff's past relevant work?

VE Borgeson opined that the hypothetical person could not perform Plaintiff's past relevant work as it was ordinarily defined.  Alternately, there were light, unskilled jobs in the five-county

---

[3]

SVP, as defined in Appendix C of the DOT, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  This training may be acquired in a school, work, military, institutional, or vocational environment. I t does not include the orientation time required of a fully qualified worker to become accustomed to the special conditions of any new job.  Www.onetonline.org/help/online/svp.

metropolitan Cleveland area, Ohio and the national economies that the hypothetical person could perform:

| JOB/DOT NUMBER | NUMBER OF JOBS IN CLEVELAND/OHIO/NATIONAL ECONOMIES |
|---|---|
| Cleaner/Housekeeper/DOT 323.687-014 | 2,500/12,000/1 million |
| Mail clerk, not in a post office/ DOT 209.687-026 | 1,400/7,000/139,000 |
| Folder/DOT 583.685-042 | 3,000/20,000/394,000 |

(Docket No. 13, pp. 264-265 of 2279).

For purposes of the *second* hypothetical, the ALJ asked VE Borgeson to assume the following:

> . . . the same individual, same age, education, work background, residual functional capacity as provided in hypothetical number one, but with the limitation that due to symptoms from medically determinable impairments, this individual would be off task at least twenty percent of the time. Could this individual perform past jobs or other jobs existing in significant numbers in the economy?

VE Borgeson responded that the hypothetical person could perform the tasks of the job but he or she would not be able to sustain those tasks on a full-time basis or for that matter, any other full-time job (Docket No. 13, p. 266 of 2279).

Counsel posed a *third* hypothetical:

> Assume an individual who is limited to light work . . . but only limited to occasional reaching and handling with the right dominant hand, frequent reaching and handling with the left hand; occasional fingering, feeling and pushing and pulling bilaterally. This individual was limited to frequent foot controls on the right and can only perform occasional climbing of ladders and scaffolds, stooping and kneeling and occasional work with moving mechanical parts, operating motor vehicles, humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold and extreme head and vibrations and moderate noise. Allowing the rest of the psychiatric limitations, this individual could understand, remember and carry out simple tasks (Docket No. 13, p. 267 of 2279).

The VE opined that this hypothetical person would not be able to perform Plaintiff's past relevant work but the hypothetical person could perform other unskilled work. If the hypothetical

person could only reach occasionally and handle occasionally with the right dominate hand, work on a full-time basis would be precluded. The same problem would apply at the sedentary unskilled level (Docket No. 13, pp. 267-268 of 2279).

### IV. MEDICAL EVIDENCE.

From 2002 to 2004,Plaintiff treated at the Far West Center, award-winning community mental health center providing behavioral health services for residents of Cuyahoga and Lorain Counties, for symptoms of depression which included paranoia, racing thoughts, confusion and the occasional violent outbursts. Plaintiff was prescribed Abilify®, an antidepressant, the side effect of which included marked drowsiness. Plaintiff's symptoms were generally controlled when he took the medication. During this time, Plaintiff's efforts to remain tobacco-free resulted in an eating disorder. Plaintiff and his parents participated in family group counseling (Docket No. 13, pp. 1533-1573 of 2279; www.farwestcenter.com).

Plaintiff underwent a sleep study on March 15, 2009, the results of which highlighted an unstable upper airway. The examiner opined that Continuous Positive Airway Pressure (C-PAP) therapy was warranted (Docket No. 13, pp. 677-679 of 2279).

From November 13, 2009 through November 19, 2009, Plaintiff obtained mental health treatment at the VA Hospital to modulate feelings of isolation, depression and paranoia. The clinician's subjective assessment of Plaintiff's social, occupational, and psychological functioning (Global Assessment of Functioning (GAF) score) suggested the presence of some impairment in reality testing or communication (ex: speech is sometimes illogical, obscure, irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking, or mood (ex: depressed man avoids friends, neglects family, and is unable to work) (Docket No. 13, pp. 554-555 of 2279; Www.gafscore.com.).

Plaintiff was admitted to the Veteran Hospital's psychosocial residential rehabilitation treatment facility on November 19, 2009. When admitted, Plaintiff had ceased taking all prescribed medications; consequently, the feelings of isolation had returned and he was fixated on the past. When discharged on December 22, 2009, Plaintiff was given outpatient medications and instructed to maintain aftercare at the Lorain County Free Clinic (Docket No. 13, pp. 593-553 of 2279).

Complaining of dyspnea, Plaintiff presented to the VA hospital on February 23, 2010. Results from chest x-rays were normal (Docket No. 13, pp. 674-675 of 2279).

There was clinical concern for a mass appearing on the computed tomography of Plaintiff's head. The attending physician compared images from March 1, 2010, March 24, 2010 and April 5, 2010, and determined that the gray and white matter was normal and that the mass was most likely a benign choroid plexus calcification (Docket No. 13, pp. 669-672 of 2279).

On October 21, 2010, Plaintiff complained of back pain and bilateral wrist numbness. The diagnostic test results showed no evidence of acute osseous abnormality or degenerative change in the back. Similarly, there was no evidence of acute osseous abnormality or significant degenerative change bilaterally in the wrists (Docket No. 13, pp. 668-669 of 2279).

The record contains massive duplicative medical records memorializing the treatment Plaintiff received at the Veteran's Hospital Residential Rehabilitation Treatment Facility from December 10, 2010 through January 27, 2011. A summary of these medical records follows:

- Clinicians acknowledged that Plaintiff had a severe and persistent mental illness and they used diverse sources of information to rule out malingering and a personality disorder, not otherwise specified. One of the methods was to reconcile his prescriptions from all sources; wean him of some medications; and monitor the intake of the medications that remained (Docket No. 13, pp. 547-551 of 2279).

- Plaintiff treated with a psychiatrist and participated in a series of weekly therapies, including recreation, psychotherapy, psychosocial skills, occupational, behavioral, spiritual, relaxation, nutritional and wellness. Plaintiff commenced using his C-Pap

11

machine (Docket No. 13, pp. 632-633; 634-637; 649-650; 651-655; 656-660; 1217-1218 of 2279).

- On January 19, 2011, Plaintiff was diagnosed with rosacea[4] and seborrheic dermatitis and a topical cream and a shampoo were prescribed (Docket No. 13, pp. 739-741 of 2279).

On January 31, 2011, Plaintiff presented to the neurological outpatient clinic to assess the nature of his migraine headaches and bilateral hand numbness.  The results from the neurological examination showed moderate, bilateral damage to a single nerve group at the wrist and mild peripheral neuropathy (Docket No. 13, pp. 618-621 of 2279).

On February 23, 2011, Plaintiff underwent a drug reconciliation session, during which he was prescribed Lisinopril, a medication used to treat hypertension and congestive heart failure.  Plaintiff returned the C-PAP machine, citing that he could not tolerate it (Docket No. 13, pp. 596-604 of 2279).

Plaintiff resided at the VA's mental health facility from March 15, 2011 through October 7, 2011, for continuing care of pathological gambling urges, mood disorder, inadequate housing and no income.  While there, Plaintiff participated in drug therapy and counseling.  The notable treatment or services rendered during his residency were:

- The rehabilitation plan included ruling out a bipolar disorder, a schizoaffective disorder and malingering.  Plaintiff religiously attended psychotherapy and group meetings.

- Plaintiff was treated for gastric reflux and chronic constipation, presumably related to the consumption of psychotropic medications.  The attending physician commented that marked obesity was at the heart of Plaintiff's problem (Docket No. 13, pp. 733-735 of 2279).

- Plaintiff's medication reconciliation reports were reviewed and discussed on June 24, 2011 and July 22, 2011 (Docket No. 13, pp. 1430-1435; 1471-1473 of 2279).

---

4

Rosacea (roz-ay-sha) is a chronic (long-term), non-curable skin condition that is identified by very common red, acne-like benign skin conditions.  The main symptoms include red or pink patches, visible tiny broken blood vessels, small red bumps, sometimes containing pus, red cysts, and pink or irritated eyes.  Www medicine net.com/rosacea.

- On July 25, 2011, Plaintiff self reported the factors that were related to his weight/obesity and wellness management.  He participated in the MOVE FITNESS program, a customized weight management and exercise program, which provided individual and group monitoring (Docket No. 13, pp. 1423-1429 of 2279; www.move-fitness.com).

- On October 7, 2011, Plaintiff continued to have serious symptoms or a serious impairment in social, occupational, or school functioning.  In fact, the attending physician noted that Plaintiff had a possible characterological pathology and chronic psychosocial difficulties (Docket No. 13, pp. 1274-1278 of 2279).

- There were numerous consultations on such issues as sleep apnea and weight control.  A standard pharmacological consultation was periodically completed to assure that Plaintiff's medications were not affecting his renal and hepatic functions.

- Plaintiff was measured for casual and sports orthotics.

- A dental procedure was administered with the goal of reducing the risk of gum and tooth disease (Docket No. 13, pp. 1285-1300 of 2279).

- Plaintiff underwent a medication reconciliation from all sources on February 11, 2011.  Plaintiff was not using the C-PAP machine; his thought process was logical and his mood was "Ok."  Plaintiff's global assessment of functioning on this date was still indicative of serious symptoms or any serious impairment in social, occupational, or school functioning (Docket No. 13, pp. 606-611 of 2279).

- Plaintiff consulted with a urologist on February 28, 2011, regarding urge incontinence.  Treatment included a trial prescription for an extended release medication (Docket No. 13, pp. 745-752 of 2279).

- On May 2, 2011, Plaintiff underwent a mental status examination during which the examiner described his mood as "Ok"; his affect was constricted; he was anxious but mood congruent; and his weight gain was stabilized.  Plaintiff was counseled on sleep hygiene measures used with some success in the resolution of insomnia (Docket No. 13, pp. 841-842 of 2279).

- Having fallen on May 4, 2011, Plaintiff underwent a radiological examination and the results showed normal shoulder joints bilaterally with minimal degenerative change at the right acromioclavicular joint.  Plaintiff's knees showed mild bilateral soft tissue swelling but no evidence of fracture or dislocation (Docket No. 13, pp. 683-687 of 2279).

- On May 17, 2011, a podiatrist confirmed that the pain in Plaintiff's heal was plantar fasciitis or jogger's heel; ordered right foot x-rays; and ordered a consultation for shoe inserts (Docket No. 13, p. 708 of 2279).

13

- On May 25, 2011, Plaintiff received testosterone depot injections to resolve hypogonadism which had resulted in erectile dysfunction (Docket No. 13, p. 850 of 2279).

- Plaintiff underwent a weight bearing examination of the right foot on June 17, 2011.  He was diagnosed with a calcaneal spur.  To ascertain the extent of his complaints of dyspnea on exertion, radiological views were taken of his chest.  The results showed mild enlargement but no pleural effusion (Docket No. 13, pp. 681-682 of 2279).

- Plaintiff underwent a urological consultation on June 22, 2011, and a coordinated electromyographic evaluation was conducted to determine bladder capacity and bladder compliance (Docket No. 13, pp. 698-699 of 2279).

- On July 25, 2011, a health scientist approached Plaintiff for his consent to participate in a plan where she would coach him in his quest to lose weight (Docket No. 13, p. 1200 of 2279).

- Plaintiff stopped objecting to pastoral care on July 26, 2011, and permitted the chaplain to set the stage for future discussions of past childhood trauma (Docket No. 13, pp. 1186-1187 of 2279).

- During the psychiatry/psychotherapy session on August 2, 2011, the clinician noted that Plaintiff was making improvement in his personality development; specifically, he was on time for the appointment, he was engaged and made eye contact; his thought process was goal directed and his thought content was devoid of auditory/visual/thermoceptive hallucinations.  Further counseling was ordered to increase the frequency and intensity of this mood stability (Docket No. 13, pp. 1182-1183 of 2279).

- Plaintiff had been undergoing weight management for some time and on August 5, 2011, the registered nurse administered a testosterone shot intramuscularly (Docket No. 13, pp. 1177-1178 of 2279).

- Dr. Daniel J. Harvey, a neuropsychologist, was retained to ascertain the source of Plaintiff's problems with his memory and attention faculties.  To that end, Dr. Harvey conducted clinical interviews on August 17, 24, and 25, 2011, and administered two tests:  the SYMPTOM VALIDITY TESTING (SVT)[5], and MINNESOTA MULTIPHASIC PERSONALITY INVENTORY (MMPI)[6].  The results from the SVT were suggestive of sub-

---

[5]

This neuropsychological test is used to establish the probability that a given test performance is affected by the tendency to fake bad, fake good and malingering.  Www.psychologiy.wikia.com.

[6]

The most frequently used standardized test of adult personality and psychopathology.  Www.mmpi.com.

optimal effort on objective neurocognitive testing.  The results from the MMPI suggested over reporting of psychopathology.  Due to the invalid MMPI profiles, Dr. Harvey could not determine the nature and severity of Plaintiff's psychiatric or psychological conditions on an objective basis.  To pinpoint retrospectively the particular source of Plaintiff's memory, concentration and cognitive inefficiency would require speculation (Docket No. 13, pp. 1383-1395 of 2279).

- On August 19, 2011, Plaintiff had used his sleep therapy equipment nine days and nine hours cumulative (Docket No. 13, pp. 1381-1382 of 2279).

- At the individual psychotherapy session on September 7, 2011, Plaintiff summarized his new communication skills and he participated in role play related to work.  Plaintiff's behavior had evolved to the extent that he was straightforward in his approach, assertive and polite (Docket No. 13, pp. 1360-1365 of 2279).

- On September 25, 2011, Plaintiff went the neurology outpatient clinic for purposes of reconciling his medications from all sources and managing his pain.  Plaintiff reported no episodes of mania or depression.  The examiner noted that Plaintiff had difficulty remembering names and details (Docket No. 13, pp. 1345-1346 of 2278).

- On September 27, 2011, the neurologist noted that Plaintiff's bilateral carpal tunnel and the numbness, burning and tingling in the outer part of his thigh were all stable with wrist splints and medication.  Plaintiff complained of memory issues (Docket No. 13, p. 1350 of 2279).

On October 21, 2011, Plaintiff commented that the new medication had successfully resolved his urinary frequency difficulty (Docket No. 13, pp. 1303-1307 of 2279).

Ms. Deborah A. Zeigler, a licensed social worker, performed a psychosocial evaluation on November 1, 2011, during which she completed a thorough review of Plaintiff's history, mental status examinations, family history, financial issues and vocational situation.   Confirming the diagnoses of a mood disorder. possible characterological pathology. homelessness, unemployment, and inadequate material resources, Ms. Zeigler attributed to Plaintiff, a current GAF at 52, a score which suggests that Plaintiff had moderate symptoms (ex: flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (ex:

15

few friends, conflicts with peers/co-workers) (Docket No. 13, pp. 1521-1528 of 2279).

During psychotherapy sessions on November 10, 2011, November 16, 2011 and November 28, 2011, psychologist Dr. Corrie Mazzeo, Psy.D., focused on decreasing mood instability and paranoid thinking. The dosage of Abilify was modified with the expectation that the accompanying shakiness would be reduced in frequency and severity or eliminated in its entirety (Docket No. 13, pp. 1729-1730; 1733-1734; 1745-1746 of 2279).

Results from the sensory and motor nerve studies conducted on December 5, 2011, were abnormal, showing electrodiagnostic evidence of bilateral sensorimotor median damage to a single nerve across the wrist. As demonstrated in a prior study, there was evidence of mild peripheral damage to multiple nerves in roughly the same area (Docket No. 13, pp. 1795-1800 of 2279).

During his psychiatric treatment on December 7, 2011, the goal was to decrease paranoid thinking. The discussion was directed at dispensing with irrational thought and decreasing the belief in paranoid thoughts (Docket No. 13, pp. 1715-1716 of 2279).

Noticing some freckles on his feet, Plaintiff presented to the podiatry clinic on December 12, 2011. Considering his neuropathy, the podiatrist determined that Plaintiff's condition was stable (Docket No. 13, pp. 1706-1710 of 2279).

On December 13, 2011 and December 27, 2011, Plaintiff presented for individual psychotherapy sessions during which he focused on relationships and jobs. Although he battled with depressed moods and paranoid thinking, Plaintiff was working on mood stability with his present medication and he was learning strategies such as mindfulness to assist with refuting thoughts of paranoia (Docket No. 13, pp. 1701-1702; 1704-1705 of 227).

On January 10, 2012, all of Plaintiff's medications from any source were reconciled (Docket

No. 13, pp. 1681-1684 of 2279).

On January 13, 2012, the optometry consultant determined that Plaintiff's ocular health and vision were both within normal limits (Docket No. 13, pp. 1675-1677 of 2275).

Plaintiff presented to the VA's neurology outpatient clinic on January 30, 2012, complaining of tingling in the second and third digits.  Treatment was deferred since Plaintiff was scheduled to undergo bilateral carpal tunnel surgery (Docket No. 13, pp. 1661-1665 of 2279).     When he moved, Plaintiff changed providers of mental health services.  Dr. Katherine K. Busby, a psychiatrist, conducted a routine outpatient evaluation on February 16, 2012, concurring in prior diagnoses of a mood disorder, mixed cluster A and B personality traits, obesity, acne and serious symptoms or any serious impairment in social, occupational, or school functioning.  Dr. Busby continued Plaintiff on Lithium and Gabapentin for mood stabilization and potential anti-suicidal efficacy (Docket No. 13, pp. 1642-1649 of 2279).

Plaintiff was discharged from residential treatment on February 6, 2012, having successfully completed the program and obtained housing (Docket No. 13, pp. 1655-1659 of 2279).

On February 29, 2012, Plaintiff met with the health technician who was monitoring his attempts at eating healthier and losing weight.  The psychologist noticed that during their biweekly session, Plaintiff's thoughts were scattered and tangential and he displayed some paranoia (Docket No. 13, pp. 1633-1636 of 2279).

On March 12, 2012, Plaintiff presented to Dr. Eulogio Sioson, M. D., a certified independent medical examiner, for a one-time disability evaluation.  Dr. Sioson conducted a (1) clinical interview; (2) completed a MEDICAL SOURCE STATEMENT OF THE ABILITY TO DO WORK-RELATED ACTIVITIES and (3) completed a MANUAL MUSCLE TESTING evaluation.

17

From the review of Plaintiff's systems, medications and history, Dr. Sioson opined that:

- Plaintiff had no overt congestive heart failure.
- Plaintiff did not sleep excessively when examined.
- Despite his history of peripheral neuropathy and bilateral carpal tunnel syndrome, Plaintiff had no numbness in the hip and right foot and no gross deformity or inflammatory change in his joints.
- Plaintiff was not emotionally labile and was able to maintain attention and concentration.

Dr. Sioson concluded that considering the limitation of range of motion from pain and all the findings, Plaintiff's activities were limited to light work (Docket No. 13, pp. 1574-1575 of 2279).

In the MEDICAL SOURCE STATEMENT OF THE ABILITY TO DO WORK-RELATED ACTIVITIES (PHYSICAL), Dr. Sioson opined that Plaintiff could/should:

- Never lift/carry 21 to 50 pounds; occasionally lift/carry 11 to 20 pounds and continuously lift/carry up to 10 pounds.
- Sit for thirty minutes at one time without interruption; stand for one hour at one time without interruption; and walk for thirty minutes at one time without interruption.
- Sit for two hours in an eight-hour workday; stand for six hours in an eight-hour workday; and walk for four hours in an eight-hour workday.
- Occasionally reach, handle, finger, feel and push and pull with his right hand; and frequently reach and handle with his left hand and occasionally finger, feel and push/pull with his left hand.
- Frequently climb stairs and ramps; occasionally climb ladders or scaffolds; frequently balance; occasionally stoop and kneel and never crouch and crawl.
- Never expose himself to unprotected heights.
- Perform activities such as shopping; traveling without a companion; ambulate; walk one block on uneven surfaces at a reasonable pace; use public transportation; climb at a reasonable pace using a simple hand rail; prepare a simple meal and feed himself; care of his personal hygiene; and sort, handle or use paper files (Docket No. 13, pp. 1576-1581 of 2279).

In the MANUAL MUSCLE TESTING analysis, Dr. Sioson concluded that:

- Plaintiff could raise his shoulders, elbows, wrists, fingers, hips, knees and feet, including the great toe, against maximal resistance;
- Plaintiff's ability to grasp, manipulation, ability to pinch and engage in fine coordination was normal in both hands;
- Plaintiff had a full range of motion in the cervical spine, elbows and ankles.

18

- Plaintiff had a limited range of motion in his shoulders, wrists, hands-fingers, dorsolumbar spine, hips and knees (Docket No. 13, pp. 1583-1585 of 2279).

Dr. Herschel J. Pickholtz, Ed.D., a psychologist, conducted a mental status evaluation and clinical interview on March 13, 2012, after which he concluded that Plaintiff's current levels of intellectual functioning based upon the results of his mental status fell within the average range of performance; his long-term memory capacities, based on recall of personal history, appeared to be in the average range; the extent of current evaluative process fell within the mild range of impairment and the impact of psychiatric complaints on the capacities to perform daily activities in an appropriate and timely fashion, interact with others and are for the wants, needs and demands of daily living seem to fall with the slight range.

Using the classifications found in the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, Dr. Pickholtz made the following diagnosis and described the features of the given mental disorder:

| AXIS AND WHAT IT MEASURES | DR. PICKHOLTZ'S DIAGNOSES |
|---|---|
| One represents acute symptoms that need treatment. | Mixed polysubstance abuse in remission; alcohol dependence in remission, bipolar disorder in almost full remission with mild residual depression, ADHD and pathological gambling. |
| Two assesses personality disorders and intellectual disabilities. | Personality disorder, not otherwise specified, related to addictive features. |
| Three describes physical problems that may be relevant to diagnosing and treating mental disorders. | Some physical complaints were noted. |
| Four records life events that may affect mental health diagnosis and treatment. | Occupational and economic problems and mild residual psychiatric symptoms, physical problems and personality issues. |
| Five is the overall GAF | 61 -- Some mild symptoms (ex: depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning, but generally functioning pretty well; has some meaningful interpersonal relationships. |

Dr. Pickholtz concluded that Plaintiff's estimated IQ fell within the average range; that his

capacities for attention and concentration fell within the borderline to average ranges; and his capacity for pace and persistence fell in the average range.  With psychiatric treatment and sobriety, Plaintiff's capacity to relate to co-workers and supervisors was not impaired and his capacity to handle the pressures of low skilled and unskilled labor, as a consequence of his mild residual psychiatric symptoms, was slightly impaired (Docket No. 13, pp. 1590-1599 of 2279).

Dr. Pickholtz completed the MEDICAL SOURCE STATEMENT OF THE ABILITY TO DO WORK-RELATED ACTIVITIES (MENTAL) on March 20, 2012 and he opined that:

- Based on mild residual psychiatric symptoms, Plaintiff's ability to understand, remember and carry out instructions affected his impairment.
- Based on current presentation, Plaintiff's ability to interact appropriately with supervision, co-workers and the public and respond to change in the work environment was affected by his impairment (Docket No. 13, pp. 1587-1589 of 2279).

On March 16, 2012, a psychologist, two clinical nurse specialists and a social worker coordinated an interdisciplinary treatment plan with goals to reduce impulsive acts and to improve his relationships (Docket No. 13, pp. 1968-1969 of 2279).  In psychotherapy, Plaintiff identified excessive exercise and paranoia as his warning signs and difficulty concentrating and paranoia as his persistent symptoms (Docket No. 13, p. 1971 of 2279).  During the community meeting group, Plaintiff expressed feelings of frustration (Docket No. 13, p. 1975 of 2279).

Mr. Gerald R. Hopperton, a physician assistant, completed a SCARS/DISFIGUREMENT DISABILITY BENEFITS QUESTIONNAIRE on March 17, 2012, in which he explained that Plaintiff had scars on his body and/or disfigurement of his head, face, neck and trunk and/or extremities.  It was Mr. Hopperton's opinion that these scars did not impact Plaintiff's ability to work (Docket No. 13, pp. 1945-1957 of 2279).

Mr. Hopperton completed a MALE REPRODUCTIVE SYSTEM CONDITIONS DISABILITY BENEFITS

QUESTIONNAIRE on March 17, 2012, in which he explained that there was a link between the diminished functional activity of the gonads and Plaintiff's erectile dysfunction.  There were no benign or malignant neoplasms or metastases related to this diagnosis (Docket No. 13, pp. 1958-1965 fo 2279).

From March 19, 2012 to March 30, 2012, Plaintiff attended a host of therapies:  group, relaxation, individual, spiritual, stress management and psychotherapy.  He was generally attentive, active and participated fully in each group and/or activity (Docket No. 13, pp. 1879-1944 of 2279).

Once Plaintiff was settled in his own subsidized housing on or about March 15, 2012, mental health counselor Ian B. Shapiro provided structured support to help Plaintiff function independently.  A plan for psychosocial intervention was completed that consisted of vocational rehabilitation, group therapy and psychotherapy.  On March 30, 2012, all of Plaintiff's medications were reconciled with the symptoms of mental impairments (Docket No. 13, pp. 1600-1607; 1608-1609; 1611-1621; 1627-1632; 1871-1879 of 2279).

On March 20, 2012, Plaintiff was diagnosed with callosities, dry skin and diabetes mellitus II.  Plaintiff's nails were trimmed, tissue from the right heel pared, lotion applied to his feet and diabetic shoes and socks were ordered (Docket No. 11, pp. 2175-2176 of 2279).

Plaintiff was enthusiastic during the group session on April 5, 2012; reported that his mood was tired and drained on April 9, 2012; he actively participated in the group session on April 11, 2012; and Plaintiff requested an emergency appointment with the psychiatrist to discuss the past on April 12, 2012.  During the session on April 12, Dr. Busby provided supportive listening and affirmation that Plaintiff was progressing well.  She was not persuaded that Plaintiff was at risk of harming himself or others (Docket No. 13, pp. 1821-1828; 1843-1850 of 2279).  On April 13, 2012,

Plaintiff graduated from the mental health psychotherapy group program (Docket No. 13, p. 1819 of 2279).

Plaintiff was awarded Chapter 31 benefits[7] on April 9, 2012.  He planned to attend college as a part of his plan for vocational rehabilitation (Docket No. 13, p. 1982 of 2279).

Plaintiff was diagnosed with tennis elbow on April 16, 2012.  At this time, there were only small risks of septic arthritis, acute arthritis, elbow bursitis and elbow cellulitis, so the nurse recommended several over-the-counter pain medications and gentle muscle stretching and strengthening exercises (Docket No. 13, pp. 1809-1811 of 2279).

Plaintiff attended gambling aftercare treatment on April 19, 2012 and April 26, 2012. Plaintiff was concerned about the opening of the Cleveland casino and the effect it would have on his ability to visit downtown Cleveland (Docket No. 13, pp. 1988; 2126-2128 of 2279).

On May 11, 2012, Plaintiff was treated for left elbow pain.  Diagnosed with lateral epicondylitis, the attending physician advised Plaintiff to wear a band/brace and ice the muscle. Plaintiff was given an anti-inflammatory drug for pain (Docket No. 13, pp. 2095-2101 of 2279).

On June 4, 2012, Plaintiff reported to Dr. Busby that he was having a bad week due to the death of his grandmother.  Nevertheless, Plaintiff was sleeping well and he was an active participant in gambling aftercare (Docket No. 13, p. 2066 of 2279).

Plaintiff underwent a successful left carpal tunnel release on June 11, 2012 (Docket No. 13, pp. 2046; 2056; 2234-2235 of 2279).  He was evaluated for possible physical medicine rehabilitation on July 16, 2012 (Docket No. 13, p. 2219-2228 of 2279).

---

[7]

During a basic period of eligibility, the Department of Veteran Affairs provides vocational rehabilitation benefits and services for disabled veterans to assist them with achieving maximum independence in their daily living activities.  38 C.F.R. § 21.40 *et. seq.* (Thomson Reuters 2014).

Later in July 2012, Plaintiff was having difficulty after moving to a new location with the new provider of mental health services. Consequently, his mood worsened and paranoid episodes surfaced. Having had several psychosocial setbacks, Plaintiff sought more frequent visits with the mental health provider and members of his support system (Docket No. 13, p. 2014 of 2279).

Plaintiff was treated at the emergency room on August 1, 2012, for increased urination (Docket No. 13, pp. 1990-1991 of 2279).

On September 18, 2012, Plaintiff presented with intermittent pain in the left elbow. The over-the-counter medication "took the edge off" but failed to provide significant pain relief. Diagnosed with chronic left tennis elbow, the attending physician modified the medication and suggested that Plaintiff wear the "force brace" daily (Docket No. 13, pp. 2200-2205 of 2279).

Plaintiff underwent a right carpal tunnel syndrome release on September 24, 2012 (Docket No. 13, pp. 2268-2272 of 2279).

The radiological study of Plaintiff's chest administered on November 10, 2012, when he complained of pleuritic chest pain, showed mildly enlarged cardiac shadow with an increase in bilateral pulmonary congestion and interstitial densities (Docket No. 13, pp. 2262 of 2279).

Plaintiff presented on November 11, 2012, with complaints of abdominal pain. The diagnostic study of his abdomen showed nonspecific bowel gas pattern in the abdomen and pelvis with no air fluid levels. There was no evidence of bowel dilatation (Docket No. 13, pp. 2263-2264 of 2279).

Plaintiff underwent a consultation on November 13, 2012, with Dr. Rachanon Murathanun, an endocrinologist, for purposes of discussing other forms of hormone replacement (Docket No. 13, pp. 2164-2168 of 2279).

23

Dr. Blakely Richardson, a dermatologist, conducted an examination on November 29, 2012 to determine why the lesion on Plaintiff's chest had changed color.  Dr. Richardson reassured Plaintiff that the mole on his left chest was progressing normally.  Dr. Richardson educated Plaintiff about the irregular signs and when he should seek medical treatment (Docket No. 13, pp. 2143-2146 of 2279).

Dr. Busby referred Plaintiff to a rehabilitation consultant to determine whether he needed occupational therapy. On December 5, 2012, a counselor determined that Plaintiff would benefit from assistance with budgeting, wellness and self-esteem.  Plans were made to address these issues (Docket No. 13, pp. 2158-2159 of 2279).

By January 30, 2013, Plaintiff had moved in with his parents, completed two semesters at Cuyahoga Community College and he was sleeping up to eight hours nightly with the use of his C-PAP machine.  However, life stressors had gotten the better of Plaintiff and he no longer controlled his eating or consumption of cigarettes and illicit drugs.  Plaintiff continued to attend Alcoholics and Gamblers Anonymous (Docket No. 13, pp. 2133-2137 of 2279).

On February 27, 2013, Plaintiff underwent a consultation to follow up on his carpal tunnel release surgeries.  Plaintiff admitted that he wore the splint at night occasionally and there was some residual swelling.  The surgical sites were well healed and there was no need for further follow up (Docket No. 13, pp. 24-27 of 2279).

### V. THE LEGAL FRAMEWORK FOR EVALUATING DIB CLAIMS

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are found at 20 C.F.R. § 404.1520 and 20 C.F.R. § 416.920, respectively.  The statutes are identical for purposes of evaluation.

SSI and DIB are available only for those who have a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. §§ 423(a) and (d), *See also* 20 C. F. R. § 416.920)). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C. F.R. § 416.905(a) (same definition used in the SSI context)).  To be entitled to DIB, a claimant must be disabled on or before the date his or her insured status expires. *Key v. Callahan*, 109 F. 3d 270, 274 (6th Cir. 1997).

To determine disability, the Commissioner has established a five-step sequential evaluation process for disability determinations found at 20 C. F. R. § 404.1520.  *Colvin*, *supra*, 475 F. 3d at 730.

First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (*citing* [*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)].

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. *Id.*  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience.  *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.  *Id.*

25

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.  *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 525, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original).  If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates.  *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

### VI. THE ALJ'S FINDINGS.

After careful consideration of all the evidence, the ALJ made the following findings:

Step 1:    Plaintiff met the insured status requirements of the Act through December 31, 2014. He had not engaged in substantial gainful activity since July 1, 2010, the alleged onset date.

Step 2:    Plaintiff had severe impairments, specifically:

- Bipolar disorder.
- Carpal tunnel syndrome.
- Peripheral neuropathy of the right lower extremity.
- History of substance abuse with gambling addiction.
- History of ADHD.

Step 3:    Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Moreover, Plaintiff had the residual functional capacity to perform light work except that he could:

- Not climb ladders, ropes or scaffolds.
- Occasionally to frequently handle and manipulate.
- Not be exposed to hazards.
- Understand, remember and carry out simple tasks without fast paced demands, high production quotas or frequent changes and with superficial interactions.

Step 4:    Plaintiff was unable to perform any past relevant work.

Step 5:    Considering Plaintiff's age, education, work experience and residual functional capacity, there were and are jobs that exist in significant numbers in the national economy that Plaintiff could perform.

The ALJ concluded that Plaintiff has not been under a disability, as defined in the Act, from July 1, 2010 through the date of the decision or July 2, 2012 (Docket No. 13, pp. 367-375 of 2279).

**VII. STANDARD OF REVIEW.**

A district court's review of a final administrative decision of the Commissioner made by an ALJ in a Social Security action is not *de novo*. *Norman v. Astrue,* 694 F. Supp.2d 738, 740 (N. D. Ohio 2010) *report adopted by* 2011 WL 233697 (N. D. Ohio 2011).  Rather, a district court is limited to examining the entire administrative record to determine if the ALJ applied the correct legal standards in reaching his decision and if there is substantial evidence in the record to support his findings.  *Id.* (*citing Longworth v. Commissioner of Social Security*, 402 F.3d 591, 595 (6th Cir. 2005)).

"Substantial evidence" is evidence that a reasonable mind would accept to support a conclusion. *Id.* (*See Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971)).  The substantial evidence standard requires more than a scintilla, but less than a preponderance of the evidence.  *Id.* at 740-741.  To determine whether substantial evidence exists to support the ALJ's decision, a district court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility."  *Id.* (*citing Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)).  Further, a district court must not focus, or base its decision, on a single piece of evidence.  Instead, a court must consider the totality of the evidence on record.  *Id.* (*see Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978)).  If there is conflicting evidence, a district court generally will defer to the ALJ's findings of fact.  *Id.*

The Sixth Circuit instructs that "[t]he substantial evidence standard allows considerable latitude to administrative decision makers.  *Id.*  It presupposes that there is a zone of choice within

27

which the decision maker can go either way without interference by the courts." *Id.* (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)) (emphasis added)). Accordingly, an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Id.* (*citing Jones v. Commissioner of Social Security*, 336 F.3d 469, 477 (6th Cir. 2003)). However, even if an ALJ's decision is supported by substantial evidence, that decision will not be upheld where the Commissioner "fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Id.* (*citing Bowen v. Commissioner of Social Security*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VIII. ANALYSIS.

Plaintiff seeks reversal and remand of the ALJ's decision for reasons that:

- The evidence in the record, inclusive of all of Plaintiff's symptoms, would impose a greater mental restriction than the one found by the ALJ.
- He cannot manipulate and therefore he cannot perform light work.
- The ALJ presented an improper hypothetical question and thus the VE's answer does not constitute substantial evidence on which the ALJ could rely.

Defendant argues:

- The ALJ's decision is consistent with the statutory and regulatory scheme for evaluating disability claims, including mental restrictions.
- The ALJ was not required to include additional manipulative limitations in his hypothetical question based upon either the opinion of Dr. Sioson or Plaintiff's subjective complaints. Rather, the ALJ's hypothetical question, which limited Plaintiff to occasional-to-frequent handling and manipulation, included all of the restrictions supported by the evidence of record.

## 1. PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY.

Plaintiff suggests that the residual functional capacity in this case is flawed and the

limitations imposed by the ALJ fail to provide any meaningful consideration of Plaintiff's symptoms such as ongoing paranoia, anxiety, labile mood, anxiety, racing thoughts and ruminative thinking.

Residual functional capacity is what an individual can still do despite his or her limitations. *Johnson v. Commissioner of Social Security*, 2013 WL 5531366, *23 (N.D.Ohio,2013) (*citing* TITLES II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 1996 WL 374184, SSR 96–8p, *1 (July 2, 1996)).  Under settled practice, residual functional capacity is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work related physical and mental activities.  *Id*.  Ordinarily, residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis.  *Id*.  A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Id*.

Once the Commissioner determines that a mental impairment exists, he/she must then evaluate the degree of functional loss it causes according to a special procedure.  20 C.F.R. §§ 404.1520a and 416.920a (Thomson Reuters 2014).  A standard document, called the PSYCHIATRIC REVIEW TECHNIQUE FORM, must be completed at each level of administrative review.  20 C.F.R. §§ 404.1520a and 416.920a (Thomson Reuters 2014).  This form, which corresponds to the Listing of Impairments for mental impairments, lists the signs, symptoms, and other medical findings which establish the existence of a mental impairment.  20 C.F.R. §§ 404.1520a and 416.920a (Thomson Reuters 2014).

The special procedure then requires a rating of the degree of functional loss resulting from the impairment.  20 C.F.R. § 404.1520a(c)(3) and 416.920a(c)(3) (Thomson Reuters 2014).  A plaintiff's level of functional limitation is rated in four areas:

- Activities of daily living;
- Social functioning;
- Concentration, persistence, or pace; and
- Episodes of decompensation.

20 C.F.R. §§ 404.1520a(c)(3) and 416.920a(c)(3) (Thomson Reuters 2014).  Where the mental impairment is found to be severe, a determination must then be made as to whether it meets or equals a listed mental disorder.  If it does not, the Commissioner must then complete a MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT FORM.  This form also seeks to evaluate functional loss; however, it is intended to provide a more detailed analysis than that provided by the PSYCHIATRIC REVIEW TECHNIQUE FORM.  The Commissioner must determine if this mental residual functional capacity is compatible with the performance of the individual's past relevant work, and if not, whether other jobs exist in significant numbers in the economy that are compatible with this assessment.  20 C.F.R. §§ 404.1520(e)-(f), 404.1520a(c), 416.920(e)-(f) and 416.1520a (c) (Thomson Reuters 2014).

Here, the ALJ considered that Plaintiff had two severe mental impairments.  Because neither mental impairment met nor medically equaled a listed impairment, the ALJ was required to assess Plaintiff's residual functional capacity.  The regulations require that the "standard document outlining the steps of this procedure" be completed at each level including the ALJ hearing.  The reference to the "steps of the procedure" refers to the five-step sequential evaluation process that requires the Commissioner to determine whether the claimant's condition meets or equals the listings and, if it does not, to then determine whether his residual functional capacity prevents him from

30

performing his past work or any relevant work.

The ALJ did not attach the MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT required by regulation. He did, however, incorporate the application of the technique within the decision (Docket No. 13, pp. 371-373 of 2279). The ALJ identified the regulation and detailed the requirements used in making such an assessment. The ALJ's summary conclusions derived from the evidence suggests that he considered that despite his subjective complaints, Plaintiff had consistently demonstrated an ability to understand, follow instructions and remember the past; that through all of his counseling and his attendance at school, Plaintiff demonstrated an ability for sustained concentration and persistence; that he had limited social interaction, and that with all of the life changes, he had shown a limited ability to adapt. Ultimately, the ALJ concluded that Plaintiff could understand, remember and carry out simple work tasks without fast paced demands, high production quotas or frequent changes with superficial interaction with others (Docket No. 13, pp. 370-372 of 279). This conclusory statement incorporates the requirements of the special technique paradigm as it relates to Plaintiff in its entirety.

The Magistrate finds that the ALJ did not err by failing to give considerable weight to the symptoms of ongoing paranoia, anxiety, labile mood, anxiety, racing thoughts and ruminative thinking as they were not measurable abnormalities evidenced by a standard medical diagnostic procedure including laboratory tests, physical examination findings or similar tests that would support the presence of disability or indicate a functional limitation. Apart from his conjecture, Plaintiff neither argues nor points to psychological evidence observed by the treating and examining physicians or counselors that these symptoms, individually or collectively, affected his functional limitations. The VA physicians treated Plaintiff over thirty-six months yet no one remarked that his

31

symptoms contributed to any functional limitations.

The Magistrate finds that Plaintiff's first claim is not well taken.

## 2.        ABILITY TO MANIPULATE.

Plaintiff argues that the ALJ erred by determining that he could perform light work particularly since the evidence and conclusions of Dr. Sioson suggest that Plaintiff had no restrictions in his ability to manipulate.

Contrary to Plaintiff's contention, the ALJ gave considerable deference to Dr. Sioson's opinions respecting Plaintiff's ability to manipulate.  Dr. Sioson conducted a one-time examination and observed that Plaintiff had tenderness in his wrists and numbness in his fingers but no evidence of atrophy or gross deformity.   Dr. Sioson concluded that Plaintiff's specific manipulative limitations suggest that he could occasionally reach, handle, finger, feel and push and pull with his right hand; and frequently reach and handle with his left hand and occasionally finger, feel and push/pull with his left hand (Docket No. 13, pp. ).  Moreover, Dr. Sioson determined that Plaintiff's ability to grasp, "manipulate," pinch and engage in fine coordination was **normal** in both hands.

Plaintiff is mistaken to the extent that the ALJ did rely on Dr. Sioson's determination that Plaintiff's manipulative capabilities were not more restrictive than the ALJ's residual functional capacity finding.

The Magistrate finds that Plaintiff's second claim is not well taken.

## 3.   THE  HYPOTHETICAL  QUESTION.                                    .

Plaintiff challenges the ALJ's failure to properly account for his manipulation deficits in the hypothetical question posed to the VE and in the residual functional capacity finding.

At steps one through five of the sequential analysis, the claimant bears the burden of proving

his impairments render him incapable of working. *Janda v. Commissioner of Social Security*, 2013 WL 3200611, *4 (N.D.Ohio,2013) (*see Jones v. Commissioner of Social Security*, 336 F. 3d 469, 474 (6ᵗʰ Cir.2003)). At step five, the burden shifts to the Commissioner to show that there are jobs existing in the national economy which can accommodate the claimant's RFC. *Id.* The Commissioner can satisfy this burden by showing "substantial evidence that a claimant has the vocational qualifications to perform specific jobs [.]" *Id.* (*citing O'Banner v. Secretary of Health Education & Welfare*, 587 F.2d 321, 323 (6ᵗʰ Cir.1978)). "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question, but only 'if the question accurately portrays plaintiff's individual physical and mental impairments.' " *Id.* (*citing Varley v. Secretary of Health & Human Services*, 820 F.2d 777, 779 (6ᵗʰ Cir.1987) (*citing Podedworny v. Harris*, 745 F.2d 210, 218 (3ʳᵈ Cir.1984)).

In this case the issue to be decided is whether Plaintiff is limited by his inability to manipulate. During the first hearing, the ALJ adequately formulated hypothetical questions that he found credible and supported by the medical evidence. A cautious ALJ incorporated a limitation that the hypothetical individual could not perform **frequent** handling and manipulation. Even with these limitations, the ALJ made a reasoned residual functional capacity determination that there was light exertional work that would accommodate Plaintiff's inability to manipulate.

After further consultative tests were performed and the record was supplemented with all of the VA medical records, the record contained electrodiagnostic evidence that confirmed the nerve damage across Plaintiff's wrist but there was no evidence that Plaintiff's bilateral carpal tunnel was of the severity to preclude manipulation in either the right or left hands. After the release, Plaintiff's carpal tunnel syndrome appeared to be stable provided he wore wrist splints (Docket No. 13, pp.

33

1350; 1578; 1724; 2200; 2202; 2220-2221 of 2279).  Even the attending plastic surgeon commented that Plaintiff's right hand was well perfused and that he had sensation in his fingers and palmar cutaneous branch.  Plaintiff had discrimination in his right index finger and little fingers as well as the left index and little fingers.  Plaintiff did not complain that he encountered difficulty manipulating.  During physical therapy management, Plaintiff was able to manipulate and grip when using the dumbbells to perform wrist exercises.  The record does not suggest that he complained of his inability or difficulty with manipulation (Docket No. 13, pp. 2148; 2150; 2203-2204 of 2279).

The Magistrate declines to make a finding that Plaintiff has such a postural limitation that affects his ability to engage in normal daily activities without support by substantial evidence in the record.  The VEs' testimony constitutes substantial evidence as in both cases, their testimony was based on properly phrased hypothetical questions that were based on competent medical evidence in the record at the time of their analysis, observations from Plaintiff's attending and treating physicians and Plaintiff's own descriptions of his limitations.  The ALJ did not err in relying on such testimony and resolving the differences in the opinions when assessing Plaintiff's residual functional capacity.   The Magistrate finds that Plaintiff's third claim also lacks merit.

## X. CONCLUSION

For the foregoing reasons, the undersigned Magistrate Judge affirms the Commissioner's decision and dismisses Plaintiff's case.

**IT IS SO ORDERED**.

s/Vernelis  K.  Armstrong
United States Magistrate Judge

Date:  February 14, 2014

34